UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **THE GLUTEN FREE BAKING COMPANY LLC**, an Oregon limited liability company, and **UNITED STATES BAKERY**, an Oregon corporation,<br><br>Plaintiffs/Counterclaim Defendants,<br><br>v.<br><br>**CANYON BAKEHOUSE HOLDINGS, LLC**, a Missouri limited liability company, and **CANYON BAKEHOUSE, LLC**, a Colorado limited liability company,<br><br>Defendants/Counterclaim Plaintiffs. | Civil No. 3:17-cv-00146-MO<br><br>OPINION AND ORDER |

**MOSMAN, J.,**

This matter comes before me on Plaintiffs' Motion for Full or Partial Summary Judgment [30]. After oral argument, I denied the Motion as to Counterclaim #1 and granted the motion as to Counterclaim #2. Minutes [44]. I took the Motion under advisement as to Counterclaims #3 and #4 and asked the parties to submit by email supplemental evidence on the circumstances under which Plaintiffs allegedly acquired the alleged trade secrets at the start of the joint venture.

1

Minutes [44]. The Court received those emails. For reasons stated below, I DENY Plaintiffs' Motion for Summary Judgment on Counterclaims #3 and #4.

## BACKGROUND

Plaintiffs Gluten Free Baking Company LLC ("GFBC") and United States Bakery ("USB") and Defendants Canyon Bakehouse Holdings, LLC ("CBH") and Canyon Bakehouse, LLC ("CB") produce baked goods. In October 2012, USB and CBH jointly formed and owned Northwest Canyon Bakehouse ("NWCB"). After about a year, the parties decided to unwind the relationship, but the unwinding process took another year. At the end of that process, USB acquired NWCB entirely, and renamed it GFBC. The parties signed a License Agreement that was dated March 25, 2015 but with an effective date of January 1, 2015. Complaint [1] Ex. 1 [hereinafter "License Agreement"] at 1. In that agreement, CBH gave USB a limited license to produce and distribute gluten-free products made or derived from CBH's gluten-free formulas, in exchange for quarterly royalty payments for a set period of time. *See* License Agreement.

Today, USB makes gluten-free baked goods using derivatives from the CBH formulas. It continues to make royalty payments under the License Agreement. USB makes gluten-free baked goods for its brand name (Franz) and also for private labels (e.g., Sam's Choice for Walmart). For private-label customers, USB packages the bread in the customer's label at USB's baking facility, and then delivers bread to the customer's warehouse. The customer then delivers the bread from the warehouse to its retail stores.

At issue in this case is the information that USB disclosed to its private-label customers. CBH alleges that USB violated the License Agreement when it disclosed, at various times and to various customers, the final weights and/or percentages of some of the ingredients in the bread. CBH does not dispute that USB may disclose a list of the ingredients, which is required for the

FDA nutrition panels. CBH also asserts that disclosure of the final weights and percentages of some ingredients violates state and federal trade secrets laws (Counterclaim #3 & #4). USB moved for summary judgment against CBH's trade secret counterclaims.

**LEGAL STANDARD**

Summary judgment is appropriate if there is no genuine dispute of material fact, viewing the evidence in the light most favorable to the nonmoving party. Fed. R. Civ. P. 56(a). A genuine dispute of a material fact is "one that could reasonably be resolved in favor of either party." *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

**DISCUSSION**

CBH's third counterclaim alleges that USB violated the federal Defend Trade Secrets Act, 18 U.S.C. §§ 1836–39. Enacted in May 2016, the Act provides a federal cause of action to owners of trade secrets that are misappropriated where the trade secrets are related to products used in interstate commerce. 18 U.S.C. § 1836(b).

CBH's fourth counterclaim alleges that USB violated the Colorado Uniform Trade Secrets Act. The federal Defend Trade Secrets Act's misappropriation was modelled in part after the Uniform Trade Secrets Act; the provisions relevant to this case are quite similar. *See* H. Rep. No. 114-529, at 4–5, 12–14 (2016), as reprinted in 2016 U.S.C.C.A.N. 195–211.

Under the federal Act, a trade secret is information that the owner has taken reasonable measures to keep secret and that derives independent value from not being generally known to others. § 1839(3). Under the Colorado Act, a trade secret is information which is secret and of value. Colo. Rev. Stat. § 7–74–102(4).

Under both Acts, "misappropriation" includes "disclosure . . . of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure . . . knew . . .

3

that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy." § 1839(5); Colo. Rev. Stat. § 7–74–102.

I. **Whether CBH failed to sufficiently identify its trade secrets**

First, USB argues that CBH did not sufficiently identify its trade secret. Some courts have granted summary judgment where the owner of the trade secret failed to identify the trade secret with specificity. *See, e.g., Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1165–67, 1168 (9th Cir. 1998) (interpreting the California Uniform Trade Secrets Act). I disagree. As CBH states in its Answer and Counterclaim, its "trade secrets include specific formulas for the manufacture of gluten free baking products." Answer [11].

II. **Whether USB improperly acquired the trade secrets**

Second, USB argues that CBH's trade secrets were not misappropriated because they were not improperly acquired. USB is only liable if it acquired the secret under circumstances giving rise to a duty to maintain the secrecy. *See* § 1839(5); Colo. Rev. Stat. § 7–74–102. CBH contends that USB "acquired" the trade secrets through "use of the trade secret when the entities were in joint venture." Defs' Response to Pls' Mot. for Summ. J. [37] at 36. It was then, CBH says, that the duty to keep the information secret arose. *Id.*

Because CBH had not cited evidence on the circumstances surrounding USB's acquisition of the trade secrets, I asked the parties to submit any further evidence of those circumstances. At oral argument, I emphasized that CBH was to submit evidence "without any new discovery at all." Tr. [45] at 61; *see also* Tr. [45] at 62 ("I said no new discovery and I meant it."). I did so because allowing post-argument supplementation by CBH was an act of leniency. It was within my discretion to require CBH's counterclaims to stand or fall on the record made at summary judgment.

4

CBH's submission appears not to have followed that instruction. CBH submitted the declaration of Josh Skow, the owner and CEO of CBH since 2009. *See* Skow Decl. [submitted to the court by email] at 2. That declaration attached Exhibits A–I. CBH also submitted a brief in support. USB pointed out that Exhibits A, B, D, E, and G appeared to be new discovery. *See* Email from Christopher Pallanch to the Court (April 19, 2018). USB also noted that I did not request additional briefing. *Id.* I agree, and have not considered any new legal arguments raised, nor have I considered any evidence in Exhibits A, B, D, E, and G.

Nevertheless, the evidence submitted in Exhibits C, H, and I do suggest that USB acquired the trade secrets under circumstances giving rise to a duty to maintain its secrecy. For example, Exhibit H is a series of emails between Marc Albers, who was the COO and President at USB (who became the Director of NWCB) and Josh Skow, the CEO of CBH. In October 2012, Mr. Albers wrote to Mr. Skow and asked him to send the formulas. Mr. Skow responded and said that "NW Canyon should have an NDA, that is signed by all folks seeing confidential info, whether they are inside of the company, or outside of the company. . . . We just don't want our formula floating around out there without the recipients having an NDA on file." Skow Ex. H at 783–84. In response, Mr. Albers "agree[d] we need to keep a tight lid on the formulas." *Id.* Exhibit C is a nondisclosure agreement, signed by Mr. Albers, that explicitly prohibits disclosure of trade secrets and recipes. Exhibit F is a Confidentiality and Intellectual Property Agreement that Mr. Albers sighed. Exhibit I is further emails between Mr. Skow and Mr. Albers. Mr. Skow says that "We have every single employee at Canyon Bakehouse sign this NDA," and Mr. Albers responds "[w]e will implement." Skow Ex. I at 786.

Based on this evidence, I find that there is a question of fact as to whether the trade secrets were acquired under circumstances giving rise to a duty to maintain its secrecy.

5

### III. Whether the contract preempts the misappropriation claims

Even so, the question remains whether the License Agreement entirely forecloses CBH's trade secrets claims. USB argues that to the degree there was confidential trade-secret information, the parties contracted how to handle that information. Therefore, USB says, the only claims about any misappropriation arise out of the contract. At oral argument, USB agreed that the fact that a contract governs the parties' relationship does not per se eliminate any misappropriation claim. Transcript [45] at 58. But USB contends since the contract specifies how to handle the trade secrets, the parties intended to displace other remedies.

Specifically, USB points to the License Agreement's integration clause, which reads:

> This Agreement and the Rescission Agreement constitute the entire agreement between the Parties and supersedes [sic] all prior or contemporaneous agreements, understandings, or representations by or among some or all of the Parties with respect to its subject matter.

License Agreement at 10. USB also argued that because the Agreement defined trade secrets, defined the scope of the license, set limits on disclosure, and provided that it was the only agreement between the parties, the License Agreement forecloses other statutory rights that one party might bring for the same conduct that constitutes a breach of the contract.

In response, CBH points to the License Agreement's remedies clause:

> Each Party acknowledges and agrees that the CBH Formulas and the Protected Information are unique and one or more Parties hereto would be irreparably harmed and damaged if any of the provisions of this Agreement are not performed . . . . Accordingly, in addition to any other right or remedy to which a Party may be entitled, at law or in equity, each Party shall be entitled to enforce any provision of this Agreement by a decree of specific performance . . . . No remedy conferred upon or reserved to any Party hereto by this Agreement is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given to any Party under this Agreement or now or hereafter existing at law or in equity or by statute.

6

License Agreement at 12. USB responds that remedies clause speaks only to remedies, and not to statutory rights that the parties may have.

But the paragraph does say that parties may seek specific performance "in addition to any other right or remedy to which a Party may be entitled." Though the contract language addresses the trade secrets, and provides remedies for unauthorized disclosures, I find nothing in the contract to foreclose an independent statutory trade secrets claim.

## IV.     Whether CBH owns the trade secrets

USB argues that because CBH does not own the trade secrets, its counterclaims under the Acts automatically fail. This argument raises two issues, one legal—do the Acts require ownership?—and one factual—does CBH own the trade secrets?.

### A. Do the Acts require ownership?

Here, the statutes diverge. The federal Act grants a cause of action to the "owner of a trade secret." 18 U.S.C. § 1836. An "owner" is the entity with "rightful legal or equitable title to, or license in, the trade secret." 18 U.S.C. § 1839(4). CBH concedes that the federal Act requires ownership.

But CHB argues that the Colorado Act does not require ownership. On the one hand, the Act does not include ownership as an element. *See* Colo. Rev. Stat. § 7–74–101. And some case law refers to the "holder" of the trade secret, rather than the "owner." *See Saturn Sys., Inc. v. Militare*, 252 P.3d 516, 521–22 (Colo. App. 2011) (listing the elements and referring to "the holder of the trade secret"). On the other hand, Colorado courts have not considered whether there is any important distinction between "holder" and owner." Even *Saturn Systems* refers to the "owner of trade secrets." *Saturn*, 252 P.3d at 522. In addition, the Act defines trade secret

7

with reference to the owner's protective measures. § 7–74–102 ("To be a 'trade secret' the owner thereof must have taken measures to prevent the secret from becoming available . . ..").

Even if ownership is not specifically listed as an "element," the Colorado Act and the case law clearly contemplate that the trade secrets are "owned" by the party with the trade secrets claim. Thus, I find that the Colorado Act, like the federal Act, requires ownership.

### *B. Does CBH own the trade secrets?*

USB contends that CBH does not own the trade secrets in question—that is, the ingredient weights and percentages for NWCB Derivative products that USB disclosed to its private label customers.

On the one hand, the License Agreement specifies that "NWCB will own exclusive right, title, and interest in and to all confidential and unique derivative works of the CBH Formulas developed by NWCB." License Agreement at 5. It further notes that "in no event will there be any obligation by NWCB or USB to pay royalties on any NWCB Derivative beyond the period" set forth in the Agreement. License Agreement at 5. That language suggests that NWCB (and therefore USB) owns the ingredient weights and percentages information that USB disclosed, since the relevant formulas were "derivative works of the CBH Formulas developed by NWCB."

On the other hand, a different section of the Agreement provides that "Confidential Information is a valuable trade secret of CBH" and that the confidential information is the property of CBH. License Agreement at 6. The License Agreement defines "Confidential Information" as "information . . . of a proprietary, private, secret, financial or confidential nature." License Agreement at 1. The definition explicitly includes "all memoranda, summaries, notes, analyses, compilations, studies or other documents prepared by [USB] that contain, reflect or are derived from [that confidential] information." License Agreement at 1.

Thus, by the terms of the License Agreement, USB owns derivative works of the CBH Formulas, but CBH owns documents prepared by USB that are derived from its confidential information. This arrangement is odd, but there is at least a genuine dispute about whether CBH owns the disclosed ingredient information at issue.

## CONCLUSION

Defendants' trade secrets claims withstand each of Plaintiffs' challenges on summary judgment. I DENY Plaintiffs' Motion for Full or Partial Summary Judgment [30] against Defendants' Counterclaim #3 and #4.

Dated May 7, 2018

MICHAEL W. MOSMAN
Chief United States District Judge